Next case is Kansas City Southern Rwy Co. v. DSK Ltd. Yes, Your Honor. Mr. Gilliam. Good morning. May it please the Court, I'm Bobby Gilliam from Shreveport representing the Kansas City Southern Rwy Co. This is an appeal from a summary judgment where all evidence and factual inferences must be viewed in the light most favorable to the non-moving party. It arises out of a major derailment that occurred in central Louisiana in a rural area at a private farm crossing. The crossing had been there a long time, since 1942. It was served by private roads owned and maintained by the defendants and it solely benefited the defendants so they could traverse the crossing and go to different sides of their property. The district court, we believe, failed to properly apply the standard for summary judgment for three reasons. First, in their brief, the defendants acknowledged that there were many factual disputes raised by KCS in the brief. The court did not particularly, we believe, address those factual disputes. Secondly, there are many and a large number of uncontroverted facts that weigh heavily against summary judgment. And we will talk about those a little more later. And then finally, the court also failed to properly apply certain controlling jurisprudence and made factual determinations clearly reserved for the jury. In this case, what happened, the farm crossing that traversed the KCS main line accessed by private roadways was used in a different manner. It had always been a farm crossing. But on this particular day, there was an unprecedented event when this land leveling, earth moving equipment was allowed to cross this crossing. It was 70 to 80 feet in length. It weighed 70,000 to 80,000 pounds. It was very low clearance. They had three blades protruding from below, and they could all be controlled. And the center blade was lower than the other two. Counsel, you've already settled with him. The fault was done by him. And you're settled. What's your duty to the owner of the land? Your Honor, this is the duty that they owe to you. In this case, there's different duties, and I'll say it different ways. One, they knew, they admitted that they knew that this was heavy, low clearance equipment. They admitted, Your Honor, that they knew this was going to be a dangerous movement that could get stuck on or damage the rail. 3B testified they knew that in advance. They also knew that this kind of equipment had never gone across the crossing before. And so under those circumstances, we have KCS, and they put signage up. And one of the signs says, call for emergency or call for a problem. Number two, they had traversed this crossing before. And, of course, the railroad doesn't know when they traversed. They had used spotters on prior occasions, not just once. Their testimony was, we had used spotters, quote, a lot. And on this occasion, when the most dangerous movement that we're ever aware of occurred. As a legal matter, Judge Ridley's asked, what is the source of the duty that the landowner owed to the railroad? The landowner, several sources. One would be 2315, that's the Louisiana Civil Code, of reasonableness and negligence. And we think that is a jury issue under these particular facts, under these particular facts. Secondly, when there is an unreasonably dangerous condition under Article 2317, that is an issue they cannot traverse the crossing when it's an unreasonably dangerous condition. It's kind of a strict liability argument that Louisiana applies under 2317. And what the court did was find that they were an independent contractor. That was one of the findings the court made. And they made it under Hickman, which is the Louisiana Supreme Court case with the five factors. And one of the first factors is there must, it presupposes a contract between the parties. What happened here was this land leveling, earth moving equipment had been working on adjoining property for five and a half months. You've got DSK, the owner, and 3B, the lessee, the farmer lessee. He was leasing both properties. He had worked with them next door for five and a half months. So they finished that job, and so they were solicited by 3B and DSK, can you come on over here and do this one more thing for us? But it was done in writing, admitted, no contract or agreement, period. There was no contract or agreement. Secondly, another Hickman factor is you've got to look, was there any duration of the work? Was there a duration specified in the work? There's no contract, so there is no duration specified. Number three, there needs to be a price or discussion of a price. It is admitted. There was no price. There was no discussion of a price. The owner for DSK, Mr. Kendrick, even said no. I just got a call and said, can I get these guys to come over here and do this? And I said yes. I didn't know if it was free or what, but there was no discussion of a price. And finally, another one that is critical to finding an independent contractor relationship is the factor that there's got to be some liability attached with a breach, some liability. In this case, anybody could have walked away. There was no liability whatsoever. And Hickman pointed out that this is the most telling fault in the contention, that the facts present an independent contractor relationship. And in Hickman, they even had a writing. Here we had nothing. I take it from your pivot to independent contractor that you think if there was an independent contractor relationship, then there's no liability under 2317. If there's an independent contractor relationship, I think they're trying to avoid the liability. I'm saying, assuming that there were an independent contractor relationship, you wouldn't have a claim under 2317. I think there wouldn't be a claim under 2315, Your Honor. They're still in possession of an unreasonably dangerous condition, and if they allowed that to take place, I still think there could be a claim under 2317. What condition did the landowner and the lessee have control of? I mean, what's your theory? The landowner and the lessee, they completely controlled the roads. They owned the roads. They maintained them every day. Now, this is the important principle here. This is a narrow factual issue. The railroad doesn't maintain the slopes up to the crossing. Not on public roads, really, and certainly not on private roads. The landowners maintained it and 3B testified up to the edge of the crosstimes. This was a slope crossing. There's no doubt about it. It had a slope. You've got a 70-foot piece of equipment here. You've got the tractor on this side. You've got the low-slung scrapers behind it. One's going to be going downhill and one's still going uphill, and in the middle, you've got the apex. Well, that's because of the equipment. What's the condition on the land? The condition on the land would be the hump and slope crossing. So anybody, let's say a workman who just was out there in his pickup and it was a low-slung pickup and hit it, would that be the same situation? No, no, for this reason. It was allowed to be a farm crossing. Regular tractors can go across. Farm equipment can go across. It was maintained and expected to be a farm crossing since 1942. The problem was the condition, the usage of the crossing changed. All of a sudden, one afternoon without any notice. So the unreasonable condition is it's only unreasonably a condition when certain types of vehicles cross it. That's correct. And for the usage put on this particular day, still using it as a farm crossing is fine, and that is not a problem or unreasonably dangerous, but you can't put it to this kind of use and expect it to be safe. This equipment was more than twice as heavy as the DOT regulations. You said 80,000 pounds. Something in that range. Depending on each one, 70,000 to 80,000 pounds. You've got to get a permit, depending on the axles, at 48,000 pounds in Louisiana. Very heavy equipment. But we had it studied, and it's in the record. I mean the clearances were minimal. And it's not only the clearances. You had four different pieces of this, and this was tandem trailers, each one. They would hook down. They don't even have tires in the front or in the back, so they lean forward like this and lean forward, and they're designed to scoop up anything, roots, stumps, dirt, gravel, whatever. They're powerful. And there's no way the rail going over it can withstand the lateral forces. Rail is designed to take vertical forces. So this was a dangerous movement. So first, the independent contractor relationship, and this was decided by this court in Newcomb v. Northeast. They went through factors like this and looked at all the facts, and the court said it was improper to grant a summary judgment. These conflicting factors presented a mixed question of fact and law as to the nature of the relationship. Therefore, a summary judgment was inappropriate. That was the 1983 case. But there's a second important issue. There's an unsafe practice exception to the independent contractor rule. Even if we set aside the factual issues and the factual disputes, the unsafe practice exception says, if he exercises control over the methods or operation or gives express or implied authorization to an unsafe practice. Again, what happened here was the lessee, who was leasing both properties, went to the DSK owner and said, Can I get these guys, they're finishing up over here, can I get them to come over here and do this for us? I don't remember. Is there any evidence that the owner or the lessee was personally out there when the crossings occurred? No. He took them out there, showed them the work to do. They got in his truck, one of their employees. So is there any evidence they knew one way or the other whether there would be spotters? Well, the only evidence we have is they'd worked with them before in the five and a half months next door. They came over here. Nobody discussed spotters. They didn't ask for spotters or require them. But here's the important point. Precision, and they testified, this is not undisputed, Precision said, Here, you could have it. Precision said the work was done under the supervision of 3B. Precision says that in writing. They admitted it. And so they, in effect, said, Here's my equipment and here's my employees. Was 3B out there supervising? No. But 3B, well, 3B took them to the scene, showed them where they wanted the work done on the private road, which is a factor because it's an integral part of their work, and they said, And I want you to move the dirt here. Then 3B left. But they went and under the unsafe practice exception, they expressly authorized, in fact, they solicited the work. Were they told that there wouldn't be spotters? They did not discuss spotters to our knowledge. But they did, and I think that's particularly important, Your Honor, when 3B admitted that in the past they had used spotters, quote, a lot, and they'd used them in situations not nearly as dangerous as this with this kind of equipment. This kind of equipment can exceed by about ten times what is necessary to displace the rail, and it doesn't take much rail displacement to result in a major derailment. And here we had three engines, 16 cars on the ground, crew members hurt, and all of that. Your Honor, I think the unsafe practice exception, again, and there are several cases right on point on this. We cited by the court Davis v. Mobile, Bartholomew v. C&G, and I think the important point when you look at all these facts, the size, the weight, the very low clearance, some of our folks were calculating at most you could have maybe had two and a half inches of clearance on a good day if the tires were full, but they can't really tell because everything was torn up so badly after the fact. There's no doubt they solicited the work, but here this is a factual determination about whether this was an unsafe practice with all these uncontroverted facts that I'm laying out for you, and I'm having to cover them quickly. But this is an issue reserved for the jury to determine whether this was an unsafe practice, and that's what all these other cases say in various situations. It's kind of like finally determining reasonableness or unreasonableness under a negligence standard. Thank you, Your Honor. I think my yellow line is gone also. I do want to say also under the assumption of the spotter issue, I think that's also an important issue in light of the past practices. Also, KCS provided spotters. That's part of what they did. We had testimony that's in the record on a weekly basis. Somebody calls, got an issue, they provide certified spotters that have radios, et cetera, that can prevent this problem. But in this case, spotters were used in the past. They weren't used at this time. There was no notice whatsoever, and they didn't take precautions themselves between all of them to make sure that this could have been accomplished safely. They took no precautions. Thank you. I'll reserve the rest of my time. Thank you. May it please the Court, Ed Wallace on behalf of Appellees Cross Appellants. I'd like to refer to the appellants as KCS and appellees will be the landowners, if that's all right with the Court. This is an appeal from a summary judgment which was granted based upon basic core material facts. Number one, there was a derailment of a train. Number two, the train cannot derail unless the precision tractor literally pries apart the tracks. The tracks cannot be pried apart unless the precision tractor operator makes an error, an operational error, and then gets his scraper stuck in between the KCS rails and then literally pulls and pulls and pulls on it. That is not a foreseeable consequence of anything the landowners could ever imagine would occur. Second... Mr. Wallace, can you hear me? Yes, Judge Southerly. One of the closing arguments by opposing counsel dealing with unsafe practices says it's a jury question, a fact question, of whether what you committed, if I'm permitted to happen out there, was an unsafe, unsafe practice. There is some evidence, some employee, that operating machinery is not dangerous so long as operators are not negligent. It does seem to me that there's at least a point that I'd like you to address that this really is a fact question. Is the penalty so small? Is the danger of an operator lifting and lowering, as necessary in the operation, might, in fairly common negligence, not lift at the right time? So whether this was operated, the whole scheme of this enormous equipment crossing these tracks is an unsafe practice. Is it really a jury question? Your response? Your Honor, I don't believe it's a jury question. The matter was presented to the district court, and based on the same arguments that counsel for KCS has raised, the evidence it was a safe practice was twofold. Number one, it's from the mouth of KCS. We asked KCS on repeated occasions, and we cited this in the brief, is it a dangerous practice, a hazard, for one of these tractors to go across the tracks with the scraper in the elevated position? Answer, no. Not once, not twice, repeated occasions. The other grounds that it's a safe practice is the proof is in the pudding. When the operators for precision did their job, they lifted up the scrapers and went across the crossing seven times, including this particular driver who had the operational error. When he went over to the other side of the railroad tracks, when he was in the travel mode, these drivers all testified, we elevate our scrapers, and they drive these on the highways, Your Honor. Counsel makes it sound like these are some sort of monster machines. These are tractors that are driven on the state highways in caravans with convoys, and they have their scrapers up. So going across this railroad crossing was not some highly unusual event. So our submission, Your Honor, is that the trial court had these facts before it of the alleged unsafe practice. The trial court, under Rule 56, said, are any of these facts about the unsafe practice exception material? The materiality, we believe, starts and stops with the events that occurred on this... I thought there was expert testimony that the weight itself and the number of times it went over this crossing made the crossing unstable or affected it some way. Yes, Your Honor. There is a very disingenuous language, if that's an appropriate term, where the experts say there were successive incremental damage. Successive incremental damage is the term of art that's used, and they say, well, when these heavy machines, tractors went back and forth across the tracks, there was successive incremental damage. The point of that is, those experts don't say, and it caused the tracks to spread apart and the derailment. They never link the two. So what they're basically saying when they talk about successive incremental damage is, I can damage this table by tapping it, according to their experts, but I'm not going to push over the table and cause a derailment. So that is... Does that answer your question, Judge Owen? Yes. Thank you. In our case, we want and suggest that the court look at the legal duties of it. The first legal duty owed, which was not mentioned by opposing counsel, is on the legal duty under Louisiana Civil Code 2320. 2320 is the dispositive governing law on master-servant and vicarious liability under Louisiana law. The burden of proof for proving master-servant is on KCS. KCS had its day in court in the trial court. The dispositive issue on a 2320 claim is, did the landowners have operational control, that is, control over the step-by-step process of what was going to be done by precision? The answer is no. They weren't there. Secondly, how could they have... If they're not there, they're not going to have any operational control. And what work were they supposed to have operational control over? Number one, driving a tractor back and forth with the elevated scraper up. So you don't need to have someone watch you do that. These are professional tractor operators. Second, do they need to have someone go tell them where to put the dirt over a culvert? That borders on absurd. So the problem with the vicarious liability claims by the plaintiff is they did not prove an essential element. Based upon Rule 56, their failure to prove an essential element on vicarious liability means there is no vicarious liability. There is sort of a red herring, if you will, on the independent contractor basis. The independent contractor defense is an alternative to vicarious liability. According to my opponents, if we do not... If there is a fact issue on independent contractor status, which is an affirmative defense, ipso facto, they prove vicarious liability. That's not the case, and that's not what the district court found. That doesn't follow. The independent contractor issues, you could have all sorts of fact issues, but it wouldn't make my clients vicariously liable for the conduct of precision. The next issue is 2315. That's the next source of legal duties under Louisiana law. We brought the motion for summary judgment, and the reason it should be affirmed is because it's essentially a cellotax motion where we pointed out that there are five essential elements that the plaintiff had to prove in order to preserve and go forward with its negligence claim. They missed two of those. The two they missed are duty owed and causation. Duty owed. So the trial court looked at what duty is owed similar to what Judge Reveley asked. What duty is owed by the landowners here, especially with respect to spotters? Because their claim is that we, the landowners, should have foreseen that there was a need for spotters. All we know is what we as landowners, farmers, are out there, and when we talk about spotters, which I'll address in a moment, that's a whole different animal from what they're talking about with these specific machinery. So first, the statute. The statute is 32-134. It's a Louisiana statute that expressly says if these machines are heavy machinery and slow moving, and if that statute applies, there's one person, one person has the exclusive duty to call KCS. The Louisiana legislature says that person is Precision. And if you take their argument, for argument's sake, if the call had been made, if Precision had done its job, then the call would have been made to KCS. KCS would then have come out and had the option of providing spotters. We submit to you that's an exclusive duty owed by Precision. Let's talk about causation. The other essential element they missed was causation. When we're looking at causation here, the only operative event is ripping apart the rails. You can have successive incremental damage all day long. That's not going to cause the train to derail. So the trial court was appropriate in making its rulings, declaring it was moot, but there was an alternative ground for ruling that the claim by the KCS would not survive summary judgment. So you have duty owed and causation. Those are two of the essential elements for a negligence claim. And they had their day in court on that under Rule 56. They didn't present material evidence that changes the outcome of the case. The outcome of this case is governed by one thing, the ripping apart of the rails, and then, of all things, the Precision driver not walking across and looking at a sign that says, hotline, if you have an accident, call KCS. How can one imagine the irresponsibility of that? So they're saying that my clients should have foreseen this irresponsible behavior and this whole calamity from prying apart the rails. Your Honor asked a question earlier about assumption of spotter duty, assumption of a duty to provide a spotter. That is based upon a case that is the Harris v. Pizza Hut case. In the Harris v. Pizza Hut case, the case involved a pizza hut that had been robbed 20 times, and they had assumed a duty to hire a security guard. Here, and the public was relying on that to protect them. So here, you have what, and to use the terms of my opposing counsel, an unprecedented movement, meaning it had never happened before. That's not what, that's not, they imagine that the landowners are supposed to go out and say, I've been involved with spotting for hopper trucks. A hopper truck is not a tractor. A hopper truck is a tractor trailer that has an open back, and the reason that you have spotters there is because the guy that's driving the truck cannot see the middle of the trailer, so he needs another set of eyes. In this specific case, it's in the record, clear as a bell. The driver of the tractor could sit in his seat, turn around, look, and see, is my scraper up or is my scraper down? There's no reason to have a spotter in this case. It's a fictional duty that's been suggested by opposing counsel here. Finally... I thought their evidence was even with the scraper up, there was only 2 1⁄2 inches of clearance. That's their evidence, Your Honor, and that is debatable evidence in terms of... It's in the record. And what about their theory that because of the way it could angle, it's kind of like getting stuck on a hauling something over a levee and get stuck? The point on the slopes and the humps they talk about with the road, those slopes and humps had no impact on what occurred. Those tractors had gone back and forth encountering these slopes and humps eight times, including the last one that messed up. He didn't encounter a hump. He was simply not paying attention, and the scraper was digging and he didn't lift it up, and that's how it got stuck. It wasn't stuck because there was a hump involved. There's absolutely no evidence, even from their experts, that the humps or the slopes or the roads had anything to do with it. In fact, the testimony of their witnesses is crystal clear. They're asked, was there anything wrong with the road? No. Have any issues with it? No. So there's no dispute about how this happened? That's correct. There's no dispute about how it happened. The only dispute is about if there's any way that they can imagine a disputed issue of fact to go back to the court again in the district court. There's one other issue, Your Honor, I'd like to mention. How do you say it happened? Tell me exactly how you say it's undisputed that it happened. Because of two things, Your Honor. Number one is the testimony of every witness from Precision saying that they went back and forth across the tracks and they didn't have any problem. Then the last guy who goes across, he's there alone, and it's undisputed he was alone. And when the other guys went back and forth across, the tracks were in good condition. Then when this guy gets stuck, then it becomes a How did he get stuck? He got stuck when he went into the crossing in between the rails and his scraper, which was behind him, had not been lifted. So he was leaving the property or he was digging around? He was leaving the property. He had finished his dirt work. Okay, I thought you said he was doing dirt work and hit it somehow. No, ma'am. No, ma'am. The dirt work was probably a quarter of a mile away. So he just forgot to raise his scraper, and that's undisputed? Undisputed. And then we also have the testimony from the fact witnesses for Kansas City. And I asked each one of them, Guys, how do you think this happened? And they said, Oh, it's pretty obvious. There are rut marks from the tires spinning where the tractor scraper got stuck and the Yahoo, excuse my French, was pulling the rails apart. And that's all there multiple times with the Kansas City people talking about their own case. Finally, Your Honor, if you don't have any further questions, I'd like to address momentarily our alternate appeal. We were a cross-appellant on the particular issue of loss of use. The trial court ruled that summary judgment was appropriate for the claim by the folks at KCS that they were entitled to loss of use, even the damages, even though there was no proof that they lost any profits or customer revenue while the three locomotives that were damaged were under repair. We agree that the three locomotives were out of commission. We agree that they were out of commission to be repaired. But the folks at KCS had a fleet of 500 locomotives. So what did they do? They didn't want to lose customer revenue. They mitigated damages. And they went and used substitute locomotives. So we did another cellotex motion. We said, Guys, here's the legal standard. The legal standard is in three cases, the interurban case under Louisiana law, the AT&T cases out of the Western District, and the MCI cases out of the U.S. Fourth and Eleventh Circuits. They all stand for the proposition that if you have an asset-producing, pardon me, income-producing asset, that income-producing asset is damaged. You're not entitled to loss of use for that unless you as the owner can show that there was a loss of profits and you didn't substitute. Here, they didn't lose any money. And we said to them under cellotex, Show us how you lost any profits or customer revenue because of the absence of these three locomotives. They came back and said, Well, we're just entitled to loss of use. And that's not it. You have to have loss of use damages. So they're entitled to be put back in the position where they would have been, but they don't have any loss. So if there's an award of loss of use damages without any showing that there was a loss of profits related to the absence of these three locomotives, that's a windfall to them because they've already earned money with the three substitutes providing the horsepower to haul the cargo for the clients. If your honors have any further questions, I'll be happy to answer. Thank you very much. Thank you. I'll briefly address some of the points. First, the contention that the slopes didn't have anything to do with it is the first I've heard of this. If you'll look in the record, the PIA report is in the report. They have the drawings showing the slope of the crossing and what happens when a 70- to 80-foot vehicle attempts to cross with low clearance, and it's pretty common sense. You've got an apex in the middle and two slopes on the other side. That's going to be the highest point. And whether it could cross, it was very obvious, and anyone should have known you cannot do this safely. Secondly, we're hearing the word tractors all the time. It's not the tractors. It is the land leveling equipment being pulled by the tractors. We have them in the record. You will see that they lean forward. They're nowhere near the clearance of tractors, and they're designed to do just what they do here, and that is rip things up. Now, there is a misunderstanding, too. I want to make sure somebody picks a point on whether it is a fact question about the slope. You do not skew, the railroad does not skew, does it, that in fact this final damaging crossing occurred when the center blade, whatever that was, was improperly sealed down as opposed to being fully up. Was that another skewed part of the record, that the center blade or any blade was lower and not raised as it should have been? Yeah, it is. KCS has alleged and our experts have indicated that the blades were not all of equal height, and one of the blades on any of these scrapers can be lower than the others, particularly the center, but it is combined, Judge. Do we think there was some contact with a rail? And the answer is yes. Do we think, though, that the rails were not pulled apart? It was not like the crew came around the curve and the rails were gone. They looked like they are still standing and like normal, but they just have to be pulled apart a little, but very clearly they said two things. There was successive and incremental damage each and every time one of these land leveling vehicles crossed, and it was weakening the structure. You have the tie plates and the spikes and all that connect. Each one of these movements was weakening the structure. Now, Mr. Breland was the one driving the... I have a question here. I've heard the evidence, even from young people, about the blade being lower than it should have been when the crossings, I've heard many times, previously had not created a problem. There were marks in the dirt where the wheels had spun, where the equipment had gotten hung up on the rail. Because what else may have contributed? And that's your point. I'm asking you maybe in a different way. Is there any dispute that, in fact, when the damage of the rail being pulled apart occurred, it was due... It occurred at a time when one of the blades was lowered as opposed to being raised as it should have been, and then the equipment, not the tractor, except that the rail being pulled, the tractor was trying to get loose from the rail. Judge, there is no dispute that that caused the damage in part. But the engineers and all that looked at it do say there was successive and incremental, but there was contact with the rail, we believe, by at least one of the scrapers being pulled by tractors. Was it in... But was it in an upright? Was that because it was not lifted? Is it disputed or not? That's what we need to know. Well, we think it's disputed based on our evidence. Some of them are saying they lifted, but as they're moving down the road, this gentleman was moving down the road and saying he lifted. How high did he lift it? Did he get it fully engaged and lifted or not? They also found problems with some of the equipment. Some of it wouldn't lift as high as it should, but even if it did on this slope, and the slope and everything was torn up after the derailment, at most, at most, you're going to have 2 1⁄2 inches, and that's on a good day. That's with full tire pressure and everything working just like it should. And we think for these reasons it was a very, very... a movement that on its face. They knew it was dangerous. That's why they used spotters in the past, and then they get to this movement and they don't for some reason. Your Honor, also briefly on the loss of use, I will say if you read in the record the detailed declaration of Kyle Overton, he detailed specifically. He's the manager of locomotives, and that's all he does is plan and use locomotives. He sets forth what occurred, the repairs made, and exactly the losses and the interruption of business that resulted from KCS, and that would answer every question about that particular issue. But in summary, Judge, without going through all the facts, which I submit when you read them all they're uncontroverted, there are many factual issues in this case that we have not been able to present. Thank you. Thank you, Counselor. The Court will take a brief recess.